IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

GLOBAL RECYCLING SOLUTIONS, LLC,
a New Jersey limited liability company,

Plaintiff,

v.

GREENSTAR NEW JERSEY, LLC, a
Delaware limited liability company;
GREENSTAR, LLC, a Delaware limited
liability company; and NTR plc, a Republic of
Ireland public limited company,

Defendants.

C.A. No. 09-976-JJF

**JURY TRIAL DEMANDED**

## SECOND AMENDED COMPLAINT

### NATURE OF THE CASE

1.     This matter arises out of a series of promises, representations and business dealings, including a July 2008 Asset Purchase Agreement ("APA") between plaintiff Global Recycling Solutions, LLC ("Global") and defendant Greenstar New Jersey, LLC ("Greenstar NJ") by which Greenstar NJ acquired Global's assets relating to its recycling operations at the Monmouth County Reclamation Center ("MCRC") in Tinton Falls, Monmouth County, New Jersey, and its contracts with various municipalities and commercial entities to process their recyclable materials.

2.     In 2006 and 2007, Greenstar NJ's corporate parent, Greenstar, LLC ("Greenstar"), and Greenstar's parent, NTR plc ("NTR"), were seeking to establish a significant presence in the United States recycling market.

3.      Prior to the APA, executive officers of Greenstar and NTR repeatedly represented to Global they were committed to funding and expanding the use of a recycling method known as "Single Stream" processing in the United States, with an emphasis in the Northeast. They also promised a commitment of funds to a long term plan for the MCRC that included converting it to Single Stream.

4.      In reliance on those representations and in order to accommodate Greenstar NJ's desire to protect it from any unforeseen unreasonable demands by Monmouth County (the "County") with regard to its post-APA continuation of the recycling operations at the MCRC, it was agreed that thirty percent (30%) of the Purchase Price under the APA -- or $1,384,500 -- would not be due to Global until it delivered to Greenstar a new five-year contract for the recycling operations at the MCRC on terms similar in form and substance to its existing MCRC contract.

5.      After the closing of the APA and despite Global's dedicated and invaluable assistance to Greenstar and NTR in achieving their business goals in the region, NTR and Greenstar froze spending and drove profits at the MCRC into the ground by reducing already conservative pricing on materials processed at the MCRC, unnecessarily increasing expenses, and manipulating the recyclable material stream to the detriment of the MCRC and for the benefit of Greenstar's Allentown, Pennsylvania facility for which it paid a premium a year before the APA.

6.      In addition, Greenstar arbitrarily and in bad faith directed Greenstar NJ to breach the APA and reject new contracts with the County on terms previously deemed acceptable. In so doing, Greenstar and NTR unjustifiably interfered with Global's contractual relations and prospective business advantage under the APA.

2

## THE PARTIES

7.      Plaintiff Global is a New Jersey limited liability company with offices at 301 Manfre Court, Freehold, New Jersey 07728.

8.      Defendant Greenstar NJ is a Delaware limited liability company with offices at 3411 Richmond, Suite 700, Houston, Texas 77046.

9.      Defendant Greenstar is a Delaware limited liability company with offices at 3411 Richmond, Suite 700, Houston, Texas 77046.

10.     Defendant NTR is a Republic of Ireland public limited company headquartered in Dublin, Ireland.

## JURISDICTION AND VENUE

11.     The United States District Court for the District of Delaware has diversity jurisdiction over this case pursuant to 28 U.S.C. § 1332 in that:

A.      Global is the Plaintiff and is a New Jersey limited liability company with its principal place of business in New Jersey and therefore a citizen of the State of New Jersey;

B.      Greenstar NJ is a Defendant and is a Delaware limited liability company with its principal place of business in Houston, Texas and therefore a citizen of the States of Delaware and Texas;

C.      Greenstar is a Defendant and is a Delaware limited liability company with its principal place of business in Houston, Texas and therefore a citizen of the States of Delaware and Texas;

3

D. NTR is a Defendant and is a Republic of Ireland public limited company with its principal place of business in Dublin, Ireland and therefore a citizen of the Republic of Ireland;

E. Because Plaintiff is a citizen of New Jersey and Defendants are citizens of Delaware, Texas, and Ireland, there is complete diversity of citizenship between the parties;

F. Plaintiff seeks damages in the minimum amount of $1,384,500, which is in excess of the jurisdictional minimum of $75,000, exclusive of interest and costs; and

G. Pursuant to Section 12.9 of the APA, Greenstar NJ and Global agreed to submit to the jurisdiction of this Court.

## FACTS APPLICABLE TO ALL COUNTS

### Global and Its Members

12. Global was formed as a New Jersey limited liability company, effective January 1, 2004.

13. At all times relevant to the facts underlying this matter, Global's members were John Stanton ("Stanton"), Harv Straus ("Straus") and Todd Heller ("Heller").

14. Stanton is an individual residing in the State of New Jersey with an address at 301 Manfre Court, Freehold, New Jersey 07728.

15. In addition to being a member of Global, Stanton is currently employed by Greenstar Recycled Holdings, LLC ("GRH"), formerly Recycled Holdings, LLC ("RH, LLC"), an affiliate of Greenstar. Pursuant to the terms and conditions of his employment agreement dated July 2, 2008 (the "Stanton Employment Agreement"), Stanton reports to Greenstar's President.

16.     Straus is an individual residing in the State of New Jersey with an address at 9 Sharon Drive, Ocean, New Jersey 07712.

17.     In addition to being a member of Global, Straus was employed by RH, LLC and reported to Greenstar's President pursuant to the terms and conditions of an employment agreement dated July 2, 2008 (the "Straus Employment Agreement").

18.     Straus's employment with RH, LLC was terminated effective June 26, 2009, less than a year into his employment with Greenstar, pursuant to a Separation Agreement and Release between Straus and GRH.

19.     Heller is an individual residing in the State of Pennsylvania with an address at 2172 New Street, Orefield, Pennsylvania 18069.

20.     In addition to being a member of Global, Heller owned Todd Heller, Inc. ("THI"), which owned and operated a recycling facility in Allentown, Pennsylvania. THI was purchased by Greenstar in or around July 2007.

Global's Innovative Recycling Operations at the MCRC

21.     Prior to becoming a member of Global, Stanton was an employee of Garden State Recycling Edison, LLC ("Garden State"), which operated a recycling facility in Edison, New Jersey.

22.     In or around 2003, Stanton was re-introduced to Straus, who conceived the idea of a recycling processing facility at the MCRC.

23.     The MCRC site is owned by the County and, at the time and still today, serves as the County's solid waste processing facility and landfill.

24.     Straus viewed the MCRC as a unique site to accommodate both solid waste and recycling processing facilities and proposed that a recycling facility at the MCRC could be mutually advantageous to both a future recycling facility operator and the County.

25.     Among other things, Straus proposed that recyclable glass, which historically has little to no profit to recycling facility operators, could be used as top cover for the landfill on site at the MCRC.

26.     Straus and the County also thought that recyclable glass could be processed and converted into an aggregate material on site in order to serve as the bottom layer of the landfill. The aggregate would last longer than the conventional material used for the landfill's bottom layer and would ultimately result in significant cost savings to the County.

27.     Straus's proposals and innovative views for the MCRC would ultimately prove correct.

28.     With Garden State's consent, Stanton, on behalf of Garden State, responded to the County's Request for Proposal for a recycling facility at the MCRC with the understanding that if Garden State were awarded the contract, it would be assigned to Global.

29.     Garden State was awarded the contract, and on October 20, 2004, it entered into a Marketing of Recyclable Materials Contract with the County (the "Global Contract").

30.     Garden State assigned all of its rights and obligations under the Global Contract to Global pursuant to an Assignment and Assumption Agreement dated October 20, 2004.

31.     The Global Contract had an initial five (5) year term, ending on December 4, 2009, subject to renewal upon mutual agreement of the County and Global for an additional term or terms aggregating five years.

32. The Global Contract granted Global the right to operate a recycling facility at the MCRC in consideration for Global paying the County (i) a fixed monthly fee of $1,000 and $200 per month for electric with some variable electric costs, and (ii) a variable monthly fee which was based on the tonnage processed by Global at the facility. Global paid the County $5 per ton for paper processed at the facility and $1.50 per ton for commingled containers (plastic containers, glass bottles and aluminum and steel cans) processed at the facility. The variable monthly fee averaged approximately $9,500 per month during the term of the Global Contract.

33. Global owed the County no other fees under the Global Contract, leaving it to benefit from the profits derived from the balance of the operation of its business at the facility.

34. The Global Contract was Global's most significant hard asset and its municipal and commercial recycling agreements were the core of its business.

35. By 2007, Global's operations at the MCRC had proven to be mutually profitable both to the County and Global.

36. Consistent with Straus's initial concept, Global's operations allowed for the processing of glass to displace the County's need for over $1 million of landfill construction materials.

37. The recycling facility at the MCRC also generated revenues for the County and served as a valuable recycling outlet to municipalities.

38. The County viewed Global's recycling operations at the MCRC as, in essence, its own and took great pride in the operations Global and the County had developed at the site. In fact, the County gave Global the Recycling Business Award for 2006 and the NJ-DEP awarded Global and the County an award for "Outstanding Achievement in Recycling" in 2006.

7

39.     The County also relied on and consulted with Global and its members for their knowledge of the recycling industry and business trends.

40.     By the end of 2007, Global and its members had established themselves as knowledgeable and important players in the greater New Jersey recycling market.

41.     By the end of 2007, Global's annual earnings before interest, taxes, depreciation and amortization ("EBITDA") from its operations at the MCRC had reached approximately $700,000.

### NTR and Greenstar Substantially Expand Into the U.S. Recycling Market

42.     Established in 1978, NTR is an international renewable energy group, which builds and runs green energy and resource-sustaining businesses.

43.     Headquartered in Dublin, Ireland, NTR's businesses extend across Ireland, the United Kingdom and North America.

44.     Headquartered in Houston, Texas, Greenstar, a member of the NTR group of companies, is one of the leading recycling-led waste management companies in North America, with a focus on the recycle processing, commodity upgrading and commodity trading sectors of the solid waste market.

45.     Employing over 550 people across 15 facilities, Greenstar processes over 1.6 million tons of waste annually and is the largest private recycler in the United States with 9,000 customer locations.

46.     Tom Roche ("Roche") is the Chairman of the Board of Directors of NTR.

47.     Jim Barry ("Barry") is the Chief Executive Officer of NTR.

48.     Mike Wynne ("Wynne") is the Chief Executive Officer of the International Recycling Operations of NTR and the former Acting Chief Executive Officer of Greenstar.

8

49.    Matt Delnick ("Delnick") is the Chief Financial Officer of Greenstar.

50.    Dennis Soriano ("Soriano") is the Chief Operating Officer of Greenstar.

51.    Steve Ragiel ("Ragiel") is the former Chief Executive Officer of Greenstar.

52.    Jeff Draper ("Draper") is the Vice President of Business Development for Greenstar.

53.    Steve Dunn ("Dunn") is the Eastern Regional President of Greenstar.

54.    At all times relevant to this litigation, Roche, Barry, Wynne, Delnick, Soriano, Ragiel, Draper, Dunn and other employees, agents and representatives were acting within the scope of their respective employments and agency relationships with NTR and Greenstar and with the actual and/or apparent authority of NTR and Greenstar.

55.    Immediately leading up to and at the time of the events underlying this litigation, NTR and Greenstar were making an aggressive entry into the U.S. recycling market, investing hundreds of millions of dollars in acquiring and developing recycling facilities throughout the country.

56.    Since 2007, it is believed that NTR invested $710 million in its U.S. renewable energy and recycling businesses with $315 million of that committed to recycling.

### NTR and Greenstar Court Global and its Members

57.    In the Fall of 2006, Ragiel, Greenstar's CEO, contacted Stanton and Heller to discuss NTR and Greenstar's investment plans for the acquisition and long-term development of recycling facilities throughout the U.S.

58.    Ragiel joined Greenstar in 2005 and was the former CEO of Recycle America, the recycling division of Waste Management, Inc.

9

59.     Ragiel told Stanton and Heller that Greenstar wanted to duplicate the scope of Recycle America's large-scale recycling operations under NTR's umbrella.

60.     Over the next several months, Ragiel and NTR and Greenstar executives, including Roche, Barry, and Wynne, met with Stanton, Heller and/or Straus on multiple occasions.

61.     During each meeting, they reiterated NTR and Greenstar's commitment of significant investment funds for the acquisition and long-term development of recycling facilities throughout the U.S.

62.     Ragiel and each of the executives from NTR and Greenstar explained that NTR wanted Greenstar to become the U.S. leader in "Single Stream" recycling with an emphasis in the New Jersey market, where it did not exist at that time.

63.     "Single Stream" recycling allows customers the convenience of putting all their recyclables into one large container for collection and processing. At the time, it was seen as the wave of the future for recycling and the NTR and Greenstar executives told Global that they wanted to be the first to fully implement Single Stream recycling in the Northeast.

64.     NTR and Greenstar executives expressed interest in acquiring Global and disclosed Greenstar's long-term plans for operating the recycling facility at the MCRC, including converting the facility, strategically located in central New Jersey, to a fully operational Single Stream processing center.  NTR and Greenstar were both aware of how highly the County thought of Global and its members and their symbiotic relationship at the MCRC.

65.     Global and Greenstar understood that the conversion of the MCRC to a fully operational Single Stream facility would likely require the installation of approximately $2 million of new equipment.

10

66. Ragiel represented NTR's and Greenstar's commitment of the funds necessary to convert the recycling facility at the MCRC to Single Stream and Wynne assured Global that money would never be an issue.

67. In addition to implementing Single Stream at the MCRC, Ragiel also expressed Greenstar's desire to utilize the two unused wings of the facility that were then controlled by the County for other recycling processes.

68. In one wing, Ragiel wanted Greenstar to take the fiber processed at the facility and make recycled pulp from the recovered fiber. Like Straus, Ragiel also appreciated the advantages of having the landfill on site, and expressed interest in using the landfill gas on the site to dry the pulp. As of April 2008, Greenstar remained interested in purchasing the methane plant at the MCRC in order to use the methane to dry solid waste at the site and produce fuel pellets and to dry the pulp at the recycling facility. In the other wing of the facility, Greenstar wanted to produce cellulose insulation from the fiber processed at the facility.

69. NTR and Greenstar executives were favorably impressed with Stanton and Straus and their operations at the MCRC, their knowledge of the recycling market in the greater New Jersey area, and their relationships within the market, each of which would prove to be an asset to NTR and Greenstar in achieving their business goals in the Northeast.

Global Loyally Assists NTR and Greenstar in Achieving Their Business Goals

70. Following the initial meetings in late 2006 and early 2007 among Stanton, Straus, Heller, Ragiel and the other top executives from Greenstar and NTR, Ragiel and other NTR and Greenstar executives maintained significant contact with Stanton and Straus and regularly called on them for advice and assistance in achieving their business goals.

*Global Assists Greenstar in its Acquisition of Todd Heller, Inc.*

71.    Global and THI had an agreement whereby Global agreed to sell aluminum, plastic and steel recyclable materials ("Lights") processed by Global at the MCRC exclusively to THI in Allentown, Pennsylvania at a fixed, below market price of $160/ton.

72.    The THI-Global Lights agreement was financially beneficial to both THI and Global.

73.    The Lights comprised a large percentage of Global's sales and generated a large percentage of THI's profits.

74.    In or around July 2007, Greenstar purchased the assets of THI for approximately $59 million, exclusive of the land and buildings.

75.    Upon information and belief, Greenstar paid a premium price for THI.

76.    Greenstar would not complete the purchase of THI's assets without assurances from Global that it would continue shipping Lights to THI on the agreed upon favorable terms.

77.    Accordingly, as a predicate to Greenstar's proceeding with the acquisition of THI, in July 2007, Greenstar urged Global to enter into a Supply Agreement with THI, assignable to PENN Acquisition Sub, LLC (apparently the affiliate of Greenstar established to acquire THI), whereby Global agreed to sell the Lights exclusively to THI (and, by assignment, Greenstar) at certain pricing and payment terms for an "initial term" of "seven years" with automatic one year renewals.

78.    As of the Summer of 2007, approximately a year and a half was left before Global's MCRC contract expired.  Consistent with Greenstar's expressed long-term plans to acquire Global's recycling operations, the Supply Agreement between Global and THI contemplated Greenstar's continuation of the recycling operations at the MCRC for more than five (5) years beyond the end of the Global Contract in December 2009.

79.    If Greenstar did not purchase all or substantially all of the assets of Global or enter into a Purchase Agreement prior to June 30, 2008, the Global – THI Supply Agreement would terminate on July 1, 2008.  As such, in order to maintain the commercially favorable terms of the Supply Agreement for Greenstar, Greenstar had to enter into a Purchase Agreement with Global prior to June 30, 2008, or else Global would be free to ship the profitable Lights to anyone of its choosing.

80.    In reliance on Greenstar's prior representations relating to the acquisition of Global and its commitment of funds and long-term plans for the MCRC, Global agreed to enter into the Supply Agreement urged by Greenstar and, in turn, assisted Greenstar in its acquisition of THI.

*At Greenstar's Request, Global Promotes Single Stream Processing in New Jersey*

81.    In addition to facilitating Greenstar's acquisition of THI, Global and its members, at the request of Greenstar in furtherance of its business goals of being a leader in Single Stream recycling in the Northeast, promoted Single Stream processing in New Jersey.

82.    Among other things, in the Spring of 2008, Greenstar capitalized on Stanton's relationships in the New Jersey recycling market and asked him to assist in a mailing campaign to promote and solicit Single Stream processing in Northern New Jersey.

83.    Also in the Spring of 2008, consistent with NTR and Greenstar's expressed plans for converting the MCRC to a fully operational Single Stream facility, Greenstar asked Stanton and Straus to lobby Monmouth County regarding Single Stream recycling, which, at that point, was not approved by County regulations.

84.    As part of that lobbying effort, in April or May of 2008, Stanton gave a presentation to the County Solid Waste Advisory Committee ("SWAC") promoting Single Stream recycling and its benefits.

85.     Although the Monmouth County Administration had already informally expressed to Stanton its support for Single Stream by that point, as a result of Stanton's presentation, the County SWAC formally recommended the approval of Single Stream in Monmouth County, paving the way for Greenstar's expressed plans for the MCRC.

86.     Greenstar's requests for assistance, including its urging Global in the Summer of 2007 to enter into the seven-year Supply Agreement with THI and its requesting Global to lobby Monmouth County to change its regulations to approve Single Stream, were wholly consistent with NTR's and Greenstar's repeated representations of their commitment of funds and long term plans for the MCRC and further supported Global's reasonable reliance on those representations.

### NTR and Greenstar's Commitment of Funds, Long Term Plans for the MCRC, and the New Monmouth County Agreement Payment Provision of the APA

87.     From the outset of NTR and Greenstar's communications with Global, Ragiel and other top executives on behalf of NTR and Greenstar advised Global of their commitment of funds and long term plans for the recycling operations at the MCRC, including the conversion of the facility to Single Stream.

88.     As of April 2008, months prior to the closing of the APA in July 2008, Greenstar had prepared a drawing for the installation of Single Stream equipment at the MCRC, which Greenstar provided to Global.

89.     In addition, in May 2008, Greenstar had Global install flooring at the MCRC at Greenstar's expense in order for the facility to be able to begin accepting Single Stream materials.

90.     Ragiel and other top executives at NTR and Greenstar had also advised Global prior to the APA that NTR and Greenstar had committed funds and were prepared to invest

14

approximately $2 million for the installation of Single Stream processing equipment at the MCRC.

91.     By that time, NTR and Greenstar had already represented and made known to Global that they were investing hundreds of millions of dollars in the U.S. recycling market. The $2 million committed by NTR and Greenstar to the MCRC was a mere fraction of the investments by NTR and Greenstar in the U.S. recycling market.

92.     Prior to the APA, Greenstar expressed its desire to enter into a 15 or 20-year or longer contract with the County for the operation of the recycling operations at the MCRC after its acquisition of Global.

93.     Global understood from the County prior to and as of the date of the APA that the County would be amenable to the scope of Single Stream processing desired by Greenstar.

94.     In addition, Global had already discussed with the County Greenstar's long term plans at the MCRC and potential interest in a 15 or 20-year or more contract with the County for the recycling operations.

95.     While the County was amenable to the concept of a long-term contract of 15 or 20 or more years for the recycling operations at the MCRC, as of the date of the APA in July 2008, with only a year and a half remaining on the Global Contract, Greenstar and Global understood that it would not be able to enter into a 15 to 20-year or more contract with the County prior to the end of the Global Contract.

96.     Therefore, Greenstar and Global agreed that Greenstar and the County would enter into a new five-year contract and begin the process of negotiating a longer-term contract with the County during the beginning of the new five-year contract.

97.     Under the new five-year contract, the County would be granted 25% of the value of the installed Single Stream equipment after five years.

98.     Greenstar also wanted the use of the two wings of the recycling facility for other projects at the MCRC.

99.     These acceptable terms of a new five-year contract were discussed during multiple telephone conferences in May and June 2008 among Draper and Greenstar's attorney, Patrick Butler, Esq., and Stanton and Straus and Global's attorney, Robert Schiappacasse, Esq.

100.    Initially, Draper advised that Greenstar was comfortable with the existing Global Contract and, therefore, wanted the new five-year contract to be the same as the Global Contract. In fact, early drafts of the APA prepared by Greenstar initially referred to the new five-year contract as a "lease extension" and stated that the new contract was to be "on terms no less favorable to [Greenstar] than the current terms" of the Global Contract.

101.    Stanton understood that a "lease extension" would not be allowed due to a change in State regulations. Thus, Stanton explained to Draper that a "new contract" would be required.

102.    Stanton also explained to Draper that Global would be unable to agree to deliver to Greenstar the "same" contract as the Global Contract or agree to deliver a contract "on terms no less favorable" than the Global Contract. Among other things, the County wanted to modify some of the terms of the Global Contract such as refining how Greenstar would pay the cost of the electric service at the facility. The County also wanted more processed glass for its use in the landfill. Stanton communicated these required changes to Draper, and Draper accepted that these changes would have to be included in the new five-year contract with Greenstar.

103. More importantly, given Greenstar's expressed desire to take over the two unused wings of the facility and convert the MCRC to a fully operational Single Stream facility, the new five-year contract with Greenstar could not be the "same" as the Global Contract.

104. Notwithstanding these changes required by Greenstar and the County, Stanton explained that the new five-year contract would be similar in substance and form to the Global Contract.

105. Draper, on behalf of Greenstar, stated that a new five-year contract similar in substance and form to the Global Contract would be acceptable to Greenstar.

106. Greenstar never stated, or implied in any way, that it wanted or believed it had the right or discretion pursuant to the APA or otherwise not to accept a new five-year contract for any reason or no reason.

107. Rather, Greenstar agreed it would accept a contract similar in form and substance to the Global Contract, including the changes Greenstar understood the County required and the changes necessitated by Greenstar's own plans at the MCRC, and that Greenstar had the right to reject a new five-year contract only if the proposed contract required unforeseen, unreasonable demands.

108. Neither of these conditions ever occurred. In fact, the County was more than reasonable and Global delivered to Greenstar a new five-year contract with new substantially changed terms requested and required by Greenstar. In the end, Greenstar took increasingly unreasonable positions with respect to its continuation of the recycling operations at the MCRC.

109. As for the timing of the new five-year contract, Draper explained that Greenstar wanted the benefit of the remaining term under the existing Global Contract in order to extend the contract term with the County as long as possible in the event that negotiations for a 15 or

17

20-year or more contract with the County following the expiration of the new five-year contract were not fruitful.

110.    Accordingly, Draper advised that Greenstar wanted the new five-year contract to begin as close in time as possible to the scheduled expiration of the existing Global Contract on December 4, 2009. For this reason and this reason alone, Greenstar chose the date of November 30, 2009 as the date by which the new five-year contract was to be obtained.

111.    The County ultimately agreed not to begin the new five-year contract until certain Single Stream equipment was installed at the MCRC. This would have given Greenstar the extra time it wanted and the existing Global Contract would have been in place until almost the end of the term. Obtaining the County's agreement to this was a significant accomplishment for Global for the benefit of Greenstar.

112.    Based on the representations of Draper and others on behalf of NTR and Greenstar regarding Greenstar's commitment of funds and long-term plans for the MCRC, and solely in order to protect Greenstar in the unforeseen event that Global could not deliver a reasonable new five-year contract, it was agreed that 30% of the Purchase Price under the APA of $4,615,000 (equaling 6.5 times Global's 2007 EBITDA), or $1,384,500, would be paid upon Global's obtaining, by November 30, 2009, a new five-year contract with the County for Greenstar's benefit with the terms sought by Greenstar.

113.    Specifically, Section 2.2 of the APA provides:

(c)    Buyer shall also hold back at Closing $1,384,500 of the Purchase Price (the "New Monmouth County Agreement Payment"). The Buyer will release to Seller the New Monmouth County Agreement Payment within five business days after Buyer's receipt of a new contract with Monmouth County for the processing and marketing of recyclable materials at the Business for a five-year term on terms acceptable to Buyer (the "New Monmouth County Agreement"), such New Monmouth County Agreement Payment to be made only in accordance with Paragraph 2.6 hereof.

114.    Section 2.6 of the APA provides:

2.6.    New Monmouth County Agreement Payment.    The New Monmouth County Agreement Payment shall be payable only upon Buyer's receipt of written evidence satisfactory to it that the New Monmouth County Agreement has been obtained for the benefit of Buyer.  If the New Monmouth County Agreement is not obtained by November 30, 2009, the New Monmouth County Agreement Payment shall no longer be due and payable to Seller and the Purchase Price shall be reduced accordingly.

115.    Part of NTR and Greenstar's inducement for Global to sell its assets to Greenstar NJ was Greenstar's commitment to continue the employment of Stanton and Straus and to incorporate Stanton and Straus into its long term plans for the MCRC.

116.    Consistent with Draper's representations to Global regarding Greenstar's commitment to obtain the new five-year contract and NTR and Greenstar's commitment of funds and long term plans for the MCRC, the Stanton and Straus Employment Agreements included language regarding the "anticipated new five-year agreement" with the County, set two-year and five-year milestone bonuses related to production and the implementation of Single Stream processing at the MCRC, and contemplated an additional five-year or longer agreement with the County beyond the "anticipated new five-year agreement".

117.    Specifically, Section 3.1(d)(i), (ii) and (iii) of the Employment Agreements provided as follows:

(d)    Special Bonuses.  Employee shall receive the following special bonuses after two years and five years of employment with the Company as set forth below, if the following milestones are achieved by the applicable date (the "Milestone Dates"), provided that Employee is employed by the Company as of the applicable Milestone Date (unless termination of Employee's employment with the Company or prior to such date is by the Company without "cause" as described in Section 2.2(c), in which case such bonus shall be paid if earned and applicable notwithstanding such termination of employment):

(i)    Two-Year Bonus.  Subject to the terms hereof, the Company shall pay to Employee within 60 days after the second anniversary of the date hereof

19

(the "Two Year Milestone Date") the following bonus amounts, but only if the following milestones are achieved on or prior to the Two Year Milestone Date with respect to the material recovery facility located at 6000 Asbury Avenue, Tinton Falls, New Jersey (the "Monmouth Facility") or at other facilities of the Employer, as set forth below:

| Two-Year Milestones | Bonus Amount |
|---|---|
| OCC and OHP screen installed at the Monmouth Facility to the Company's satisfaction at a cost to the Company of no more than $2,200,000. | $25,000 |
| The Monmouth Facility achieving a "TRIR" (as defined below) below five (5) by the Two-Year Milestone Date | $25,000 |
| Employee and Harv Straus [John Stanton] having under their responsibility and control at the Two-Year Milestone Date (whether at the Monmouth Facility or another Company facility) a volume of 500 tons per month of net new business since January 1, 2008 with an average contract term in excess of 12 months. | $75,000 |

(ii)    *Five-Year Bonus.*  Subject to the terms hereof, the Company shall pay to Employee within 60 days after the fifth anniversary of the date hereof (the "Five-Year Milestone Date") the following bonus amounts, but only if the following milestones are achieved on or prior to the Five-Year Milestone Date with respect to the Monmouth Facility or at other facilities of the Employer, as set forth below:

| Five-Year Milestones | Bonus Amount |
|---|---|

| | |
|---|---|
| Employee and Harv Straus [John Stanton] having under their responsibility and control at the Five-Year Milestone Date (whether at the Monmouth Facility or another Company facility) a volume of 1,500 tons per month of net new business since January 1, 2008 with an average contract term in excess of 12 months. | $75,000 |
| The obtaining of a new contract with the County of Monmouth providing for a minimum of an additional five years over and above the anticipated new five-year agreement with the County which should begin in 2008 or 2009; provided, however, that if the Company so elects and notifies Employee of such election no later than 30 months prior to the termination date of such new agreement, then the milestone bonus established in this section shall be conditioned upon the obtaining of a new contract with the County for a term longer than five years under the New Jersey "McEnroe Act" (Chapter 38 N.J.S.A. §§13.1E-136, et. seq.) (the "McEnroe Option") unless the Company subsequently elects not to pursue the McEnroe Option, in which case the condition for receiving the milestone bonus established in this section shall revert to the obtaining of a new five-year contract as described above at the end of the anticipated new five-year agreement that should begin in 2008 or 2009, as described above. Terms in each case must be acceptable to the Company | $50,000 |

(iii)   Definition of "TRIR". For purposes of this Agreement, the Monmouth Facility's Total Recordable Incidence Rate ("TRIR") is a measure of the

rate of recordable workplace injuries, normalized per 100 workers per year. The factor is derived by multiplying the number of recordable injuries in a calendar year by 200,000 (100 employees working 2,000 hours per year) and dividing this value by the total man-hours actually worked in the year. Recordable workplace injuries are: occupational death, nonfatal occupational illness and those nonfatal occupational injuries which involve one or more of the following: loss of consciousness, restriction of work or motion, transfer to another job or medical treatment (other than first aid).

118.     Global entered into the APA and Stanton and Straus entered into their Employment Agreements with Greenstar in reliance on NTR and Greenstar's representations regarding their commitment of funds and long term plans for the MCRC and the acceptable terms for the new five-year contract with the County following the expiration of the Global Contract.

119.     As of the date of the APA, there was no question regarding Greenstar's acceptable terms for the new five-year contract, Global's ability to deliver those terms, the parties' expectations regarding the terms of the new five-year contract, the parties' intent with regard to the New Monmouth County Agreement Payment provision of the APA, or the County's willingness to agree to the terms of the new five-year contract sought by Greenstar.

120.     Global would have never agreed to a holdback of 30% of the Purchase Price if Greenstar had the unfettered discretion to rescind its acceptable terms, reject commercially reasonable new five-year contracts with the County, and refuse to make the New Monmouth County Agreement Payment, as it represented most all of the profits on the members' investment in Global.

The Defendants (i) Rob Peter to Pay Paul,
(ii) Reject the Anticipated New Five-Year Contract Previously Deemed Acceptable, and
(iii) Abandon the MCRC, Greenstar NJ and Global

121.     Following the closing of the APA in July 2008, NTR and Greenstar reneged on its representations to Global in a downwardly spiraling series of conduct contrary to their pre-APA

22

representations and in violation of and interfering with Greenstar NJ's obligations to Global under the APA.

122.   Upon information and belief, Greenstar intentionally began operating the MCRC facility and processing municipal recyclable materials in a manner that it knew would substantially undermine its profits at the MCRC in order to benefit and prop up its profits at the former THI recycling facility in Allentown, Pennsylvania.   NTR, Greenstar and Greenstar NJ's actions were arbitrary and taken in bad faith.

123.   As of the date of the APA in July 2008, Greenstar was operating the former THI facility in Allentown, Pennsylvania.

124.   Upon information and belief, as of the date of the APA and in the months following the APA, Greenstar felt pressure to justify the purchase price it paid for, and the investments it made at, the Allentown facility and was taking steps to support the Allentown facility to the detriment of the MCRC and in violation of Greenstar NJ's obligations to Global under the APA.

125.   Among other things, after the closing of the APA, Greenstar manipulated the supply chain and funneled recyclable materials from Monmouth County municipalities which previously were, and logically and in the normal course should have been, processed at the MCRC, to its Allentown facility.   This negatively impacted the MCRC's profits, but enhanced profits at the Allentown facility.

126.   In addition, in October 2008, Greenstar reduced the per ton cost of the Lights being supplied to the Allentown facility under the August 2007 THI-Global Supply Agreement.

127.   The Lights supplied from the MCRC comprised a significant percentage of the revenues at the MCRC.   Greenstar's reduction of the per ton price for the Lights supplied to the

23

Allentown facility negatively impacted the MCRC's profits, but enhanced profits at the Allentown facility.

128.    Greenstar also unnecessarily increased selling, general and administrative expenses at the MCRC, which further negatively impacted the MCRC's profits.

129.    NTR and Greenstar also froze spending and, despite its pre-APA representations regarding their commitment of funds and long term plans for the MCRC, including the implementation of Single Stream processing at the MCRC, refused to make any investment at the MCRC and, instead, ultimately took the position that Monmouth County would have to pay Greenstar to continue to operate the recycling facility at the MCRC.

130.    Upon information and belief, NTR and Greenstar's acts following the closing of the APA were taken arbitrarily and in bad faith to the detriment of Greenstar NJ and Global in order to justify the purchase price paid by NTR and Greenstar for the Allentown facility and to artificially attempt to improve Greenstar NJ's bargaining power with the County with respect to the continuation of the recycling operations at the MCRC.

131.    One of Greenstar's first bad acts was its wholesale rejection of the new five-year contract with terms it had specifically instructed Global to obtain and which it had agreed to accept.

132.    Promptly after the APA closing, Stanton and Straus, in their capacity as employees of Greenstar, continued their pre-APA discussions with the County in earnest concerning the new five-year contract.

133.    Global, at its sole cost and expense, retained a local lawyer to assist Stanton and Straus in the continuing negotiations with the County.

24

134.    Stanton and Straus, and Global's attorney, had numerous conversations, including several meetings, to discuss the new five-year contract.

135.    Consistent with Greenstar's pre- and post-APA representations and directives, Stanton and Straus obtained the County's agreement to a new five-year contract on terms acceptable to Greenstar.

136.    The new five-year contract included the County's agreement to the conversion of the MCRC to a fully operational Single Stream recycling facility and the installation of new Single Stream screening equipment at the facility.

137.    In that regard, the County agreed to modify the "County Solid Waste Plan" to allow Greenstar to accept Single Stream recycling at the facility.

138.    Global also successfully negotiated that the new five-year contract would not begin until the Single Stream equipment was installed, thereby extending the existing Global Contract until almost the end of its term, as had been requested by Greenstar.

139.    The County also agreed to include Greenstar's use of the two wings of the facility in the new five-year contract.

140.    The County prepared and forwarded to Stanton a draft of the new five-year contract, which included all of Greenstar's desired terms.

141.    Stanton forwarded the draft of the new five-year contract to Draper on January 6, 2009 and in a January 7, 2009 email regarding the contract confirmed that the County "essentially took the existing contract and updated a few items."

142.    Earlier on January 7, 2009, Draper had responded affirmatively to his receipt of the draft of the new five-year contract by email to Stanton, saying "When do you think this will be executed?"

143.    Neither Draper nor anyone else on behalf of Greenstar ever disagreed with Stanton's description of the new five-year contact as a merely "updated" version of the existing Global Contract.

144.    Neither Draper nor anyone else on behalf of Greenstar ever advised Global that the draft of new five-year contract did not meet Greenstar's acceptable terms or included unforeseen, unreasonable demands by the County.

145.    Instead, after several weeks of exchanging correspondence concerning the draft contract, Greenstar advised Global on January 29, 2009 that it was rejecting the contract obtained by Global because NTR and Greenstar suddenly were no longer interested in converting the MCRC to a fully operational Single Stream processing facility and, therefore, would not be installing Single Stream equipment at the MCRC.

146.    Upon information and belief, Greenstar had purchased Single Stream equipment for the MCRC in or about October 2008 from Machinex. This equipment was not returned, but rather was used by Greenstar at another of its newly-acquired facilities in Iowa.

147.    Global was shocked by Greenstar's sudden change of position, which ran counter to NTR and Greenstar's representations to Global regarding its commitment of funds and long term plans for the MCRC and its conversion to a fully operational Single Stream processing facility.

148.    At the direction of Greenstar, Stanton and Straus had to advise the County that, despite its prior representations and promotion of Single Stream, Greenstar was no longer interested in converting the MCRC to a fully operational Single Stream processing facility and, therefore, Greenstar had rejected the new five-year contract obtained by Global for Greenstar's benefit.

149.    Stanton and Straus then made a second proposal at the direction of Greenstar. Greenstar's second proposal did not involve converting the facility to Single Stream, but rather included the installation of limited new equipment requiring a much smaller capital expenditure on the part of NTR and Greenstar.

150.    It was estimated that the limited new equipment would cost between $150,000 and $300,000 and, by Greenstar's own projections and estimates at the time, would result in a significant return on investment of $60,000 to more than $100,000 per month at the MCRC.

151.    The County agreed to a more limited capital expenditure at the MCRC and a meeting was to be scheduled to discuss the modified draft contract prepared by the County to be presented to Greenstar.

152.    However, before that meeting could even be scheduled, Global was instructed by Greenstar on February 26, 2009 to tell the County that it was not interested in pursuing its second proposal either.

153.    Instead, Greenstar instructed Stanton to prepare "talking points" for a meeting with the County to discuss a third proposal which called for the shipment of all commingled containers of recyclables to Greenstar's facility in Allentown, Pennsylvania.

154.    The impetus for Greenstar's third proposal was NTR's directive that no new investments be made at the MCRC and the need to fortify and increase revenues at the Allentown facility at the expense of profits at the MCRC.

155.    Greenstar needed an increased volume of recyclables to cover NTR and Greenstar's investments in and costs associated with operating the Allentown facility at the expense of the MCRC.

156.    Under Greenstar's third proposal, increased revenues of between $50,000 and $75,000 per month would be diverted from the MCRC to the Allentown facility.

157.    Under Greenstar's third proposal, starting on May 1, 2009, only paper would be processed at the MCRC. This ran fundamentally counter to the County's desire to maintain a full-service and fully functional recycling processing facility at the MCRC. Moreover, this proposal would not even satisfy the APA requirement at Section 2.2(c) which defined the required new five-year contract to be "for the processing and marketing of recyclable materials", which was the joint expectation of the parties at the time the APA was executed.

158.    In addition, glass would no longer be processed at the MCRC, but rather would be shipped in from Greenstar's Allentown facility. This was problematic, because, among other things, the County had not yet approved or tested any glass from Allentown and it had to meet particular specifications.

159.    Stanton prepared the talking points as he was instructed, but he also wrote to Dennis Soriano and Steve Dunn, Greenstar's Chief Operating Officer and Eastern Regional President, respectively, highlighting Global's concerns with such a proposal and the likelihood that it would be rejected by the County in favor of putting the County Contract out for public bid.

160.    Greenstar further advised that if the County did not accept the third proposal, Greenstar might not even bid on the Request for Proposal that the County would issue for the MCRC and would consider starting a new facility to process the recyclables supplied through its municipal contracts, thereby by-passing and, in effect, competing with the MCRC. Heller wrote to Soriano also expressing his concern.

161.    Soriano met with the County on April 3, 2009 to present Greenstar's proposal to immediately begin transferring recyclables from the MCRC to the Allentown facility purportedly due to the poor economy.

162.    By the time of the April 3, 2009 meeting, the economy in general remained poor, but the recycling market had begun returning to its pre-inception of recession performance levels. Greenstar's claimed reliance on the "poor economy" as of April 2009 was a pretext.

163.    Teri O'Connor, the Assistant County Administrator, stopped Soriano's presentation and told him that if all Greenstar was willing to offer was a "transfer" facility, there was no need to continue the meeting.

164.    Despite Stanton's previously and categorically advising Soriano and Dunn that the County would not be interested in the third proposal, Soriano disingenuously told O'Connor that he was "taken aback" by and did not expect the County's response.

165.    Soriano also threatened the County and told O'Connor that Greenstar, and not the County, controlled tons of recyclables from the municipalities through its municipal contracts and implied that if the County did not accept Greenstar's proposal, Greenstar would take the tons away from the MCRC such that no other processor would have enough tonnage to process at the MCRC. These municipal contracts were purchased from Global in the APA.

166.    On April 17, 2009, the County's attorney, Rick Sapir, Esq., wrote to Soriano and denied Greenstar the right to change any of the operations at the site until County approval was provided.

167.    On May 6, 2009, Soriano wrote to Sapir and, among other things, made clear that Greenstar would only entertain a new contract with the County if the County were willing to

agree to the changes to the existing contract that Greenstar was demanding and that those changes begin immediately.

168.    Adding insult to injury, Greenstar then took a new approach, offering the County a "partnership" whereby the County would pay Greenstar to operate the MCRC, instead of Greenstar paying the County, as per the terms of the existing contract.

169.    In connection with this new approach and justifying it to the County, there was much internal discussion within Greenstar regarding artificially and unnecessarily increasing Greenstar's selling, general and administrative expenses at the MCRC in order to make operations at the MCRC appear less profitable.

170.    At an August 25, 2009 meeting, Soriano presented two options to the County. Under the first option, Greenstar would transfer all material off site. Under the second option, Greenstar would continue operating "as is".

171.    Both options offered by Soriano at the meeting had significant risks for the County. Greenstar would take all revenues from the recyclables and deduct processing costs and profits and the balance remaining would be split with the County. However, if revenues did not cover costs, the County would be required to pay Greenstar the difference.

172.    Greenstar's options were very difficult, if not impossible, for the County to accept. Among other things, the County would be required to go to the County Freeholders on a monthly basis to obtain monies to pay Greenstar if, based on Greenstar's accounting, revenues at the MCRC did not cover costs.

173.    Soriano again threatened the County, advising that Greenstar, and not the County, controlled tons of recyclables from the municipalities through its municipal contracts and implied that if the County did not accept Greenstar's proposal, Greenstar would take the tons

away from the MCRC such that no other processor would have enough tonnage to process at the MCRC and operate efficiently.

174.   The County advised that while it wanted to continue with Greenstar under a new contract, it would have to consider putting the operations at the MCRC up for public bid.

175.   Greenstar then revised its proposal and offered the County two options, which were worse than its prior proposal.

176.   Under Greenstar's first option, operations at the MCRC would remain as is and the County would pay Greenstar $45,000/month to operate the MCRC, Greenstar would keep all revenues generated by the MCRC, and Greenstar would make no rental payment to the County.

177.   Under the second option, recyclables would no longer be processed at the MCRC and the MCRC would essentially become a transfer facility, the County would pay Greenstar $16,000/month to operate the MCRC, Greenstar would keep all revenues generated by the MCRC, and Greenstar would make no rental payment to the County.

178.   Both options of Greenstar's proposal were obscenely out of line with the existing contract and the economic realities of the relationship between the parties. Accordingly, neither of the options was acceptable to the County.

179.   As a result, the County issued a Request for Proposal on September 30, 2009 for the recycling operations at the MCRC. Bids were due by November 10, 2009.

180.   The County asked Greenstar for an extension of the existing agreement for two to three months. Greenstar agreed to an extension, but only if it did not have to make any payments to the County during the extension period. The County reluctantly agreed.

181. Four companies responded to the County's Request for Proposal. In addition to Greenstar, the proposers were Waste Management, Colgate Paperstock/Empire, and Future Recycling. The bids were open and each proposer's pricing offers were read.

182. Using Global's average tonnages, under Waste Management's proposal, the County would be paid approximately $8,000 to $10,000 per month.

183. Using Global's average tonnages, under Colgate Paperstock/Empire's proposal, the County would be paid approximately $8,000 to $10,000 per month.

184. Using Global's average tonnages, under Future Recycling's proposal, the County would be paid approximately $24,000 per month.

185. Greenstar's proposal mirrored its last proposal, which had already been rejected by the County. In stark contrast to the other proposals which included payments to the County, Greenstar's proposal included the County's payment to Greenstar of $16,000 or $45,000 per month, depending on the option chosen.

186. The County met with the four proposers on December 1, 2009. Each proposer was allocated two hours to explain its proposal. The meeting with Greenstar lasted only 40 minutes. Only Dunn and Stanton were in attendance on behalf of Greenstar. By that time, Greenstar had prohibited the involvement of Straus and Global's attorney in discussions with the County.

187. When Dunn was asked by the County's attorney Sapir to explain the pricing of the Greenstar proposal, Dunn explained that Greenstar's parent, NTR, would not allow any risk at the MCRC and the proposal was designed accordingly and at the direction of NTR. The proposal included profit for Greenstar and conservative accounting with no risk to Greenstar.

188. Sapir reiterated that the County had wanted to enter into a new contract with Greenstar months ago, and the County was disappointed that it was forced to seek other operators given Greenstar's increasingly unacceptable proposals.

189. The contract for the operations of the recycling facility at the MCRC was awarded to Waste Management.

Greenstar Refuses to Make the New Monmouth County Agreement Payment and Gets the Full Benefit of the Bargain under the APA to the Detriment of Global

190. Beginning in March 2009, Global and its members made multiple demands to Greenstar for the New Monmouth County Agreement Payment.

191. Greenstar rejected these demands and, to date, has failed to make the New Monmouth County Agreement Payment to Global.

192. In initially responding to Global's demands on March 30, 2009, Greenstar ignored the understanding and expectations of the parties at the time of the APA that the new five-year contract would be acceptable to Greenstar provided that it was similar in substance and form to the then existing Global Contract, including the changes required and accepted by Greenstar, and did not include unreasonable demands by the County. Instead, Greenstar advised that it "has not yet approved the terms for a new contract" and that it was meeting with the County to "further discuss moving toward a long-term arrangement that would be acceptable to both Greenstar and the County."

193. On September 28, 2009, following the County's resolution authorizing the issuance of the Request for Proposal for the recycling operations at the MCRC, Global again demanded the remaining payments under the APA, including the New Monmouth County Agreement Payment.

194.     In response, Wynne, on behalf of Greenstar, advised that "Monmouth County is not willing to renew its contract on terms acceptable to Greenstar". Wynne's response defied the understanding and expectations of Greenstar and Global and the intent of the APA that the New Monmouth County Agreement merely needed to be similar in substance and form to the then existing Global Contract and not include unreasonable demands by the County.

195.     Neither Wynne nor anyone else on behalf of Greenstar at any time ever advised Global of its understanding that Sections 2.2(c) and 2.6 of the APA afforded Greenstar the unilateral right not to enter into a new five-year contract with the County for any reason or no reason.

196.     To date, Greenstar has not made the New Monmouth County Agreement Payment of $1,384,500 to Global and, as such, has failed to pay 30% of the agreed upon Purchase Price for Global under the APA.

197.     Upon information and belief, the tonnage of recyclables provided to Greenstar through the municipal contracts it acquired from Global under the APA, without the continuation of the MCRC, has afforded Greenstar the equivalent of or a greater financial return than Greenstar bargained for pursuant to the APA.

198.     Accordingly, upon information and belief, by reneging on their representations and breaching and unjustifiably interfering with the express and implied terms of the APA, NTR and Greenstar paid Global only $3,230,500 (or 70% of the Purchase Price), yet received 100% or more of the value of Global's assets sold under the APA.

199.     Indeed, the September 4, 2007 Option Agreement between Greenstar and Global and the February 6, 2008 Letter of Intent from Greenstar to Global set Global's value for

34

purposes of Greenstar's acquisition of Global's assets at 6.5 times Global's 2007 EBITDA, which essentially amounted to the Purchase Price under the APA of $4,615,000.

200.    Nevertheless, as a result of the defendants' wrongful conduct, Global was deprived 30% of the Purchase Price (or 30% of the value of its assets sold to Greenstar), which represented the vast majority of Global's return on investment in creating and building Global.

**COUNT ONE**

**Breach of Contract**

201.    The allegations contained in the preceding paragraphs are incorporated herein and made a part hereof as though set out in their entirety.

202.    Greenstar and Greenstar NJ agreed to pay Global the New Monmouth County Agreement Payment upon Global's obtaining, by November 30, 2009, a new five-year contract for the benefit of Greenstar NJ for the processing and marketing of recyclable materials at the MCRC similar in substance and form to the Global Contract, including the changes required by the County and Greenstar and accepted by Greenstar at the time of the APA.

203.    Global obtained, by November 30, 2009, a new five-year contract for the benefit of Greenstar NJ for the processing and marketing of recyclable materials at the MCRC similar in substance and form to the Global Contract, including the changes required by the County and Greenstar and accepted by Greenstar at the time of the APA.

204.    Notwithstanding Global's obtaining, by November 30, 2009, a new five-year contract for the benefit of Greenstar NJ for the processing and marketing of recyclable materials at the MCRC similar in substance and form to the Global Contract, including the changes required by the County and Greenstar and accepted by Greenstar at the time of the APA, Greenstar NJ failed to make the New Monmouth County Agreement Payment to Global.

205. Greenstar and Greenstar NJ's conduct in failing to make the New Monmouth County Agreement Payment to Global amounted to a breach of Sections 2.2(c) and 2.6 of the APA.

206. As the result of Greenstar and Greenstar NJ's breach of the APA, Global suffered damages in the minimum amount of the New Monmouth County Agreement Payment of $1,384,500.

## COUNT TWO

### Breach of the Covenant of Good Faith and Fair Dealing

207. The allegations contained in the preceding paragraphs are incorporated herein and made a part hereof as though set out in their entirety.

208. Every contract, including the APA, includes a covenant of good faith and fair dealing.

209. The covenant of good faith and fair dealing requires each party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain.

210. If a contract confers discretion on one party, the implied covenant of good faith and fair dealing requires that the discretion be used reasonably and in good faith and consistent with the expectations of the parties at the time of the agreement.

211. The APA required Greenstar's and Greenstar NJ's acceptance of a new five-year contract with the County on terms acceptable to it at the time of the APA.

212. Greenstar and Greenstar NJ were required to use any discretion afforded by the APA reasonably and in good faith and consistent with the expectations of the parties at the time of the APA.

213.     Greenstar and Greenstar NJ acted arbitrarily and in bad faith and contrary to the expectations of the parties at the time of the APA in rescinding their acceptable terms for the new five-year contract, making proposals that did not even meet the required terms of the new five-year contract under Section 2.2(c) of the APA, and ultimately submitting a commercially unreasonable bid to the County that Global advised would never be accepted by the County.

214.     Greenstar and Greenstar NJ acted in bad faith by artificially manipulating its financial results from its operations at the MCRC and misrepresenting its financial condition to the County in an attempt to force the County to accept its unreasonable contract demands.

215.     Greenstar and Greenstar NJ breached the covenant of good faith and fair dealing in the APA by, among other things:

A.     Unreasonably rejecting the multiple, reasonable agreements accepted by the County contrary to the expectations of the parties at the time of the APA;

B.     Submitting commercially unreasonable proposals to the County that did not satisfy the required terms of the new-five year contract under Section 2.2(c) of the APA;

C.     Submitting a commercially unreasonable bid in response to the County's Request for Proposal;

D.     Threatening the County in the contract negotiations and prohibiting the involvement of Straus and Global's attorney in those negotiations; and

E.     Artificially manipulating its financial results from its operations at the MCRC and misrepresenting its financial condition to the County in an attempt to force the County to accept its unreasonable contract demands.

216.   As the direct result of Greenstar's and Greenstar NJ's breach of the implied covenant of good faith and fair dealing, Global suffered damages in the minimum amount of $1,384.500.

## COUNT THREE

### Fraudulent Inducement

217.   The allegations contained in the preceding paragraphs are incorporated herein and made a part hereof as though set out in their entirety.

218.   NTR and Greenstar knowingly made false statements, or made statements with reckless indifference to their truth, to Global and to the County with the intent that Global act or refrain from acting as a result of the statements and in order to induce Global to enter into the APA.

219.   Among other things, top executives of NTR and Greenstar made false statements, or made statements with reckless indifference to their truth, to Global regarding (i) their commitment of funds and long-term plans for the MCRC, including the conversion of the MCRC to a fully operational Single Stream processing facility, the installation of Single Stream equipment at the MCRC, and the potential for a 15 or 20-year or more contract with the County for the recycling operations at the MCRC, and (ii) the acceptable terms of the new five-year contract for the recycling operations at the MCRC.

220.   Global reasonably and justifiably relied upon NTR and Greenstar's false statements and statements made with reckless indifference to their truth and was fraudulently induced to enter into the APA.

221.   As the direct result of Global's reasonable and justifiable reliance on NTR and Greenstar's false statements and NTR and Greenstar's fraudulent inducement of Global to enter into the APA, Global suffered damages in the minimum amount of $1,384.500.

## COUNT FOUR

### Negligent Misrepresentation

222.    The allegations contained in the preceding paragraphs are incorporated herein and made a part hereof as though set out in their entirety.

223.    NTR and Greenstar had a duty to provide true and accurate information to Global.

224.    In violation of that duty, NTR and Greenstar supplied false and inaccurate information and made false and inaccurate statements to Global and to the County.

225.    Among other things, top executives of NTR and Greenstar supplied false and inaccurate information and made false and inaccurate statements to Global regarding (i) their commitment of funds and long-term plans for the MCRC, including the conversion of the MCRC to a fully operational Single Stream processing facility, the installation of Single Stream equipment at the MCRC, and the potential for a 15 or 20-year or more contract with the County for the recycling operations at the MCRC, and (ii) the acceptable terms of the new five-year contract for the recycling operations at the MCRC.

226.    NTR and Greenstar failed to exercise reasonable care in obtaining or communicating the false and inaccurate information.

227.    Global reasonably and justifiably relied upon NTR and Greenstar's false and inaccurate information and false and inaccurate statements to its detriment.

228.    As the direct result of Global's reasonable and justifiable reliance on NTR and Greenstar's false and inaccurate information and statements, Global suffered damages in the minimum amount of $1,384.500.

## COUNT FIVE

### Tortious Interference with Contractual Relations

229.     The allegations contained in the preceding paragraphs are incorporated herein and made a part hereof as though set out in their entirety.

230.     NTR and Greenstar directed that no more money be spent in connection with the MCRC, directed that profits rightfully belonging to the MCRC be diverted to its Allentown facility, and unjustifiably interfered with the APA and Greenstar NJ's agreement to enter into a new contract with the County on terms similar to the existing County Contract.

231.     NTR and Greenstar's directives were not aimed at the shared profitability of Greenstar NJ and its affiliate in Allentown, but rather were geared toward artificially benefitting NTR and Greenstar to the detriment and at the expense of Greenstar NJ and Global. NTR and Greenstar's directives were not in furtherance of their shared legitimate business interests with Greenstar NJ.

232.     NTR and Greenstar used their control of Greenstar NJ not to enrich Greenstar NJ, but to divert value from Greenstar NJ to themselves and to make false and misleading representations to the County in the contract negotiations.

233.     NTR and Greenstar were not pursuing in good faith the legitimate profit seeking activities of their affiliated enterprise, *i.e.*, Greenstar NJ, or were motivated by some malicious or other bad faith purpose to injure Global.

234.     NTR and Greenstar's conduct was to increase the profits of the Allentown facility to the detriment of the MCRC facility, to improve their bargaining power with the County with respect to the proposed new MCRC contract with the County, and/or to avoid paying the New Monmouth County Agreement Payment to Global.

235.   As the direct result of NTR and Greenstar's tortious interference with the APA and Greenstar NJ's agreement to enter into a new contract with the County on terms similar to the existing Global Contract, Global suffered damages in the minimum amount of $1,384.500.

## COUNT SIX

### Tortious Interference with Prospective Economic or Business Advantage

236.   The allegations contained in the preceding paragraphs are incorporated herein and made a part hereof as though set out in their entirety.

237.   Global and its members had a reasonable expectation of economic advantage from Greenstar's and Greenstar NJ's continued operations of the recycling facility at the MCRC.

238.   NTR and Greenstar directed that no more money be spent in connection with the MCRC, directed that profits rightfully belonging to the MCRC be diverted to its Allentown facility, and unjustifiably interfered with Global's prospective economic advantage from the continued operations of the recycling facility at the MCRC.

239.   NTR and Greenstar's directives were not aimed at the shared profitability of Greenstar NJ and its affiliate in Allentown, but rather were geared toward artificially benefitting Greenstar and its affiliate in Allentown to the detriment and at the expense of Greenstar NJ and Global.   NTR and Greenstar's directives were not in furtherance of their shared legitimate business interests with Greenstar NJ.

240.   NTR and Greenstar used their control of Greenstar NJ not to enrich Greenstar NJ, but to divert value from Greenstar NJ to themselves and to make false and misleading representations to the County in the contract negotiations.

241.   NTR and Greenstar were not pursuing in good faith the legitimate profit seeking activities of their affiliated enterprise, i.e., Greenstar NJ, or were motivated by some malicious or other bad faith purpose to injure Global.

41

242.   NTR and Greenstar's conduct was to increase the profits of the Allentown facility to the detriment of the MCRC facility, to improve their bargaining power with the County with respect to the proposed new MCRC contract with the County, and/or to avoid paying the New Monmouth County Agreement Payment to Global.

243.   As the direct result of NTR and Greenstar's tortious interference with Global's prospective economic advantage, Global suffered damages in the minimum amount of $1,384.500.

WHEREFORE, Global Recycling Solutions, LLC respectfully requests that this Court enter judgment in its favor against Defendants for compensatory damages in the minimum amount of $1,384,500.00, plus interest, costs, attorneys' fees and any other relief that this Court deems just, proper and equitable.

PROCTOR HEYMAN LLP


/s/ *Dominick T. Gattuso*
Kurt M. Heyman (# 3054)
E-mail:  kheyman@proctorheyman.com
Dominick T. Gattuso (# 3630)
E-mail:  dgattuso@proctorheyman.com
1116 N. West Street
Wilmington, DE 19801
Telephone (302) 472-7300

*Of Counsel:*

SILLS CUMMIS & GROSS, P.C.
Trent S. Dickey
tdickey@sillscummis.com
One Riverfront Plaza
Newark, NJ 07102-5400
Telephone (973) 643-7000

Attorneys for Plaintiff
Global Recycling Solutions, LLC

Dated: April 28, 2010